UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GREGORY OWEN,

        Plaintiff,

   v.

CITY OF BUFFALO, NEW YORK;

DANIEL DERENDA, in his official
capacity as Police Commissioner of the
Buffalo Police Department;

MICHAEL QUINN, individually and in his
official capacity as Lieutenant in the
Buffalo Police Department;

JOSEPH WALTERS, individually and in
his official capacity as Police Officer; and

CHARLES SKIPPER, individually and in
his official capacity as Police Officer in the
Buffalo Police Department,

        Defendants.

_____

16-CV-743
DECISION AND ORDER

      Gregory Owen had a message he wanted to share with as many people as he

could.  He thought that a good place to share that message would be at a political event

where a large crowd was expected to gather.  But when he got there, he was confronted

by police officers who told him that he could not deliver his message where and when

he wanted to deliver it.

      Owen claims that the police violated his right to speak freely about his religion.

The police say that they were simply controlling the crowd and ensuring the safety and

movement of pedestrian traffic.  And the question therefore is which set of interests trumps the other under the circumstances here.

## BACKGROUND

On April 18, 2016, then-candidate Donald Trump was in Buffalo, New York, for a campaign rally at the First Niagara Center.  *See* Docket Item 14-2 at 1 (Defendants' Statement of Facts); Docket Item 17 at 1 (Plaintiff's Answering Affidavit).  To maintain crowd control, the Buffalo Police permitted those with tickets to the event to proceed to its entrance but segregated "protestors" in a separate location.  Docket Item 17 at 2. Gregory Owen fit into neither category.  He was not at the First Niagara Center "to protest anything."  *Id.*  Instead, he was "there to speak to people about the Gospel of Jesus Christ."  *Id.*

Owen is "an evangelical, born-again Christian . . . who strongly desires to share the Gospel (good news) of his faith."  Docket Item 1 (Complaint) at 3.  In fact, he was outside the First Niagara Center before the Trump rally to do just that.  While he was "handing out gospel tracts" on the sidewalk leading to the arena, Owen was approached by the defendant police officers who asked him to cross the street to join the "protestors."  *Id.* at 6; Docket Item 14-3 (Plaintiff's Deposition) at 34.  When Owen refused, the officers told him that if he did not leave the immediate area he would be arrested.  *Id.* at 36-38.  Owen did not leave as directed, and the police made good on their threat.  *Id.* at 38, 42.

Owen refused to move as instructed by the officers because he believed they were mistaken.  According to Owen, the officer who asked him to move "was aware of only two types of people at the rally: Attenders and Protestors."  Docket Item 17 at 2.

Owen was neither.  So when he "was asked to move to the 'protest area,'" he "explained, truthfully, that [he] was not there to protest."  *Id.* at 3.  After he was told that he had five seconds to move or be arrested, he "politely but repeatedly asked" what he would be "arrested for."  *Id.* at 3-4.  The officer "ignored [his] questions," however, and arrested him after the five seconds were up. *Id.* at 4.

Owen was charged with four counts of disorderly conduct under New York Penal Law § 240.20 for engaging in threatening behavior, making unreasonable noise, using obscene language, and obstructing vehicular or pedestrian traffic.  *See* Docket Item 14-2 at 5; Docket Item 17 at 4-5.[1]  All charges against Owen eventually were dismissed. *Id.*

Owen then sued the City of Buffalo and several members of its police department.  Docket item 1.  In his complaint, Owen alleged that the defendants abridged his freedom of speech—in particular, his religious speech; denied him his right

---

[1] New York Penal Law section 240.20 provides:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

1. He engages in fighting or in violent, tumultuous or threatening behavior; or

2. He makes unreasonable noise; or

3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

 . . .

5. He obstructs vehicular or pedestrian traffic . . . .

*Id.*

to due process; and wrongfully arrested and imprisoned him. He seeks damages as well as equitable relief.

After the parties conducted extensive discovery, the defendants moved for summary judgment. Docket Item 14. They argued that Owen's due process claim should be dismissed because it was based on his First Amendment claim and was therefore duplicative; that his First Amendment claim should be dismissed because his arrest was based on a content-neutral, crowd-control decision by the police; and that his false arrest and imprisonment claim should be dismissed because he refused to comply with a lawful order to disperse, thereby giving the police ample reason to take him into custody. Docket Items 14, 21. In his responding affidavit and memorandum of law, Owen argued that his due process claim was based on the defendants' failure to follow the New York Criminal Procedure Law and therefore not duplicative; that there is a question of fact as to whether the arresting officer knew, and arrested Owen because of, the content of his speech; and that the police had no valid reason to arrest him. *See* Docket Items 17, 19. He also argued that the defendants were not entitled to qualified immunity because a reasonable police officer would have known that he "did nothing that warranted his arrest." Docket Item 19 at 7.

After the defendants replied, the Court heard oral argument. *See* Docket Item 25. For the reasons that follow, the defendants' motion is granted.

## DISCUSSION

## I.    LEGAL STANDARD

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant."  *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); second quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962)).  On the other hand, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *Id.* (citation omitted).  In deciding whether to grant summary judgment, a court "cannot properly make credibility determinations or weigh the evidence.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Anderson*, 477 U.S. at 255).

## II.    DUE PROCESS CLAIM

In his response to the defendants' motion, Owen claims that his due process claim is grounded not in so-called "substantive due process" but rather in the defendants' failure to follow "their policies and practices" which are inherently "vague and lack sufficient objective standards to curtail the discretion of government officials." Docket Item 19 at 4.  More specifically, Owen argues that the defendants "fail[ed] to

meet the requirements of [New York Criminal Procedure Law] 110.15 regarding the standards for a misdemeanor information." *Id.* Because the charging instrument is so conclusory, he reasons, he was deprived of the process guaranteed under the Constitution. *Id.* at 4-5.

"A procedural due process violation occurs 'when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard.'" *Norton v. Town of Islip*, 97 F. Supp. 3d 241, 266 (E.D.N.Y. 2015) (quoting *B.D. v. DeBuono*, 130 F. Supp .2d 401, 432-33 (S.D.N.Y. 2000)). But because "state statutes do not create federally protected due process entitlements," the alleged failure to follow the New York Criminal Procedure Law does not, on its own, state a viable due process claim. *See Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). "Indeed, a contrary rule would bring within the scope of section 1983 myriad claimed violations of local laws, thus confusing the separate provinces of state and national laws that are central to our federal system." *McDarby v. Dinkins*, 907 F.2d 1334, 1337 (2d Cir. 1990).

The relevant question therefore is not whether the information met the requirements of New York Criminal Procedure Law section 110.15, but whether Owen was afforded "notice and an opportunity to be heard," *see Norton*, 97 F. Supp. 3d at 266. And conclusory or not, the charging instrument "sufficiently inform[ed] [Owen] of the charges against him and provide[d] enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001) (alteration in original) (citation omitted); *see also Norton*, 97 F. Supp. 3d at 267 (prosecution based on facially insufficient

6

information not cognizable as a federal due process claim).  Owen's due process claim is therefore dismissed.

## III.    FIRST AMENDMENT CLAIM

The First Amendment prohibits the government from abridging the right of free speech.  But "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."  *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).  "Restrictions on speech in designated public fora are constitutional . . . if they are content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling state interest and (2) narrowly drawn to achieve that interest."  *Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800 (1985).  Regulating the flow of traffic at events like the Trump rally qualifies as the sort of circumstance that might well give rise to a valid time, place, and manner restriction.  *See Marcavage v. City of New York*, 689 F. 3d 98, 104-05 (2d Cir. 2012).

To constitute a valid time, place, and manner restriction, government action must apply without regard to the content of the speech, be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."  *Id.* at 104 (alterations omitted) (quoting *Ward v Rock Against Racism*, 491 U.S. 781, 791).  In other words, the restriction must *restrict*, *not prohibit*, the speech at issue; provide other means to communicate that speech; and apply across the board regardless of the message.

7

Here, there is little doubt that the police had a significant interest in controlling traffic at the Trump rally.  The City of Buffalo "certainly ha[d] a significant interest in keeping its public spaces safe and free of congestion."  *See Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996).  As anyone who has ever attended an event at what was then called the First Niagara Center knows, the area around the arena becomes nearly impossible to navigate at the time of a well-attended event, and the Trump rally was well attended.  Indeed, Owen avers that the very reason he was at the event was to "share his message with a large number of people that would not otherwise receive it." Docket Item 1 at 5. Furthermore, "there can be no doubting the substantial government interest in the maintenance of security at political conventions."  *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 12 (1st Cir. 2004).

Likewise, there is little doubt that an ample alternative venue for speech was provided.  The defendants' statement of facts submitted in support of their motion for summary judgment states that "[d]esignated areas, including one" just a block away from the event "were established [for] demonstrators."  Docket Item 14-2 at 2.  In his answering affidavit, Owen does not deny that assertion.  *See* Docket Item 17 at 2. Instead, he says that he was not a "demonstrator"—he "was not there to protest anything"—and so the designated area was not for him.  *Id.*  But the label Owen chooses to apply to his conduct does not defeat the undisputed fact that there existed a reasonably-accessible alternative avenue for his speech.  *See also Marcavage*, 689 F.3d at 107 (where there was an "ample alternative channel for protestors" located at an alternative entrance a block away, rather than at the main entrance).

The only real question is whether the restriction was content neutral—that is, whether Owen was precluded from proselytizing and pamphleteering because of his message.  "Content neutral" regulations refer to limitations on speech that are "justified without reference to the content of the regulated speech."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).  "The principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward*, 491 U.S. at 791.

Owen takes issue with the defendants' assertion that the arresting officer "did not know the content of plaintiff's speech, much less disagree with it."  Docket Item 17 at 2 (citing Docket Item 14-2 at 5).  He notes that because the officer heard him speak, and because the message was prominently displayed on a banner Owen had been carrying, the officer almost certainly knew the content of the speech.  Docket Item 17 at 2.

But even accepted as true, as they must be on this motion for summary judgment, the plaintiff's assertions do not create a material issue of fact.  Whether or not the arresting officer knew the content of the speech is not what is at issue; rather, the question is whether the officer singled Owen out *because* of that content.  And the plaintiff has not offered any factual support for the proposition that the content of his speech resulted in his being asked to move or his arrest.

For example, Owen does not suggest that others with different messages were permitted to speak or hand out literature on the street restricted to attendees.  The closest he comes is his statement in the complaint that he saw "individuals . . .  freely walking into and out of the sidewalk along Washington Street [the street leading to the arena]" as well as "demonstrators . . . carrying signs and yelling slogans and chants to

9

other people in the vicinity."   Docket Item 1 at 5-6.  But he does not offer any evidence that others with different messages were allowed to hand out literature or engage in speech-related activities on the sidewalk approaching the arena, that others without tickets were allowed to congregate in the area reserved for ticketholders, or that he otherwise was singled out in any way.

On the contrary, Owen's point is that the dichotomy the police used to segregate the crowd—attendees and demonstrators—was a false dichotomy; that he was neither; and that he therefore was within his rights in refusing to obey the mistaken order of the police to move to the area assigned to demonstrators.  But the fact that the police may have labeled everyone without a ticket incorrectly as a protester, or may have incorrectly assumed that everyone who was not there to attend was there to demonstrate, does not turn a valid time, place, and manner restriction into a constitutional violation.

The fact is that by his own admission Owen did not have a ticket and was preaching and distributing literature in a place where the police were controlling the crowd by not permitting such activities—and not even permitting those without tickets to remain.  Nothing about that unconstitutionally restricted speech.

Indeed, it is the policy that Owen appears to advocate (restrict protesters' political speech but permit his religious speech on the street leading to the arena) that poses a serious risk of violating citizens' First Amendment rights.  As the Second Circuit has observed, "[p]olicing a less than clear-cut regulation" would "vest line-level officers with power and discretion to determine" which demonstrators may remain and which must relocate, "risk[ing] the fact or appearance of selective enforcement based on content."

*Marcavage*, 689 F.3d at 106.  If only protesters were relegated to the assigned area and all others allowed to speak and pamphleteer wherever they wanted, such action would not be content neutral.  What is more, if Owen "were allowed a dispensation, 'so too must other groups,' which would then create 'a much larger threat to the State's interest in crowd control' and security."  *Id.* (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 685 (1992)).

The video Owen offered of the events that day underscores this conclusion. There is no evidence of others with different messages being permitted to speak, congregate, proselytize, or hand out pamphlets.  On the contrary, it appears that those with tickets were permitted to proceed to the arena entrance; those without were not. Nothing about that crowd-control tactic suggests that the defendants' actions in restricting Owen's speech "contravene[ed] the fundamental principle that underlies [the] concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'"  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48-49 (1986) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972)); *see also Marcavage*, 689 F.3d at 104 (observing that "no-demonstration zone" around political convention was a content neutral regulation because "no demonstrating of any kind was allowed in that zone").

In sum, there is no reason to conclude other than that the police were enforcing a valid time, place, and manner restriction narrowly drawn to serve the important government interest in crowd control.  The plaintiff's First Amendment claim is therefore dismissed as well.

## IV.    FALSE ARREST/ FALSE IMPRISONMENT CLAIM

Owen fares no better on his claim for false arrest and imprisonment.

A section 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law. *Jaegly v. Couch*, 439 F.3d 149, 152-54 (2d Cir. 2006). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Id.* at 152 (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).[2] "An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Id.* (quoting *Weyant*, 101 F.3d at 852). Significantly, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with

---

[2] To the extent Owen attempts to bring a hybrid First and Fourth Amendment claim, the Court notes that "[t]he existence of probable cause defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." *Meyers v. City of New York*, 2020 WL 2079458, at *2 (2d Cir. Apr. 30, 2020) (summary order) (quoting *Caravalho v. City of New York*, 732 F. App'x 18, 23 (2nd Cir. 2018)). "Though a narrow exception exists where there is 'objective evidence' that the police refrained from arresting similarly situated people not engaged in speech," Owen has alleged "no such facts . . . here." *See id.* (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019)); *see also Nieves*, 139 S. Ct. at 1727 (explaining that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so"). For example, Owen has not "present[ed] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech [were] not." *See id.* Stated more concretely, to the extent Owen claims that the defendants arrested him in retaliation for his speech, this claim is not immune from the defendants' showing of probable cause because Owen has not presented evidence that other individuals who, like him, lacked a ticket for the Trump rally were, unlike him, not arrested after refusing to leave the no-protest zone.

respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id.* at 154. "Stated differently, when faced with a claim for false arrest, [courts] focus on the validity of the *arrest,* and not on the validity of each charge." *Id.*

The defendants argue that even if the arresting officers did not have probable cause to believe that Owen committed any of the four disorderly conduct offenses with which he was charged, they at least had probable cause to believe that he violated a different subsection of the disorderly conduct statute. *See* Docket Item 14-10 at 9-10. Under New York Penal Law section 240.20(6), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof[,] . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." Owen's argument in response amounts to a factual defense to the charge: He did not "congregat[e] with others, and he was not part of a crowd," he says. How then could he be charged with violating a statute that prohibits congregating with others in a public place and refusing a lawful order of the police to disperse, he asks. *See* Docket Item 19 at 6-7.

Owen's argument hinges on a strained and narrow view of what it means to "congregate," however. Indeed, he admits that the very reason he was where he was and did not want to leave was precisely because of the large crowd to whom he wanted to preach the gospel. The statute does not require those who congregate to do so for the same purpose. And even if it did, Owen testified that he was with at least six other church members around the time of his arrest, including at least two who were physically close enough to appear in the video footage. *See* Docket Item 14-3 at 15-16,

13

39-40.  *Cf. People v. Carcel*, 3 N.Y.2d 327, 333 (1957) ("The term "congregates with others", as used in the statute, requires at the very least three persons assembling at a given time and place.  It would be an unjustifiably liberal interpretation . . . and at variance with the strict construction called for in [disorderly conduct] cases to hold that the defendants here, only two in number and as appears from the record not even standing together, were 'congregating with others.'" (citation omitted)).  Contrary to Owen's argument, his behavior could well have led a reasonable officer to conclude that he had congregated with others.

Owen also argues that he could not have been charged with disorderly conduct because he did not have the requisite *mens rea*—he did not intend "to cause public inconvenience, annoyance or alarm."  *See* Docket Item 19 at 8-9.  But police do not need proof of a suspect's intent to arrest him; if they did, police would make few arrests. *See also Meyers v. City of New York*, 2020 WL 2079458, at *2 (2d Cir. Apr. 30, 2020) (summary order) ("We have made clear that a defendant may be guilty of disorderly conduct regardless of whether the action results in public inconvenience, annoyance or alarm if the conduct recklessly creates a risk of such public disruption." (quoting *People v. Weaver*, 16 N.Y.3d 123, 128 (2011)).  Here, the arresting officer asked Owen to move multiple times, and Owen did not comply.  That was enough to arrest him based on the risk that he would create a public disruption.  *See, e.g.*, *Pinto v. City of New York*, 728 F. App'x 26, 32 (2d Cir. 2018) (summary order) (arrest for refusal to comply with police officer's lawful order to move to a particular location); *Marcavage*, 689 F.3d at 110 (arrest of demonstrators for refusal to move to designated demonstration zone).

14

What is more, even if Owen did not violate the disorderly conduct statute, he certainly could have been arrested for simply refusing to comply with the lawful order of a police officer and therefore obstructing governmental administration. "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . ." New York Penal Law § 195.05. "An officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with a [lawful] order from a police officer." *Murray v. Ruderfer*, 2017 WL 1194371, at *5 (S.D.N.Y. 2017) (citation omitted) (collecting cases). So even if Owen is correct that there was no probable cause to arrest him for disorderly conduct, his false arrest claim still fails.

Finally, even if all that were not true, the defendants still would be protected by qualified immunity, which shields the police from civil liability for "mistakes in judgment, whether the mistake is one of fact or one of law." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Therefore, even if the police lack any probable cause to arrest, they still do not face liability for the arrest "if there was *arguable* probable cause for the plaintiff's arrest." *Pinto*, 728 F. App'x at 30 (emphasis in original). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citation omitted). "In other words, an officer is entitled to qualified immunity unless no

15

officer of reasonable competence could have made the same choice in similar circumstances." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (citation omitted).

Here, the police were trying to control a large crowd and move traffic smoothly when Owen refused to comply with several directions to move.  The police did not have the time to engage him about whether he was a demonstrator or to debate him about the propriety of what any of them were doing.  All the arresting officers knew was that Owen was somewhere they thought he shouldn't be and that he would not leave after being asked to do so several times.  Holding the police liable for an arrest under such circumstances would not only be contrary to established law but would severely hamper the police whenever they face the prospect of controlling large crowds or moving large numbers of people.

In sum, the police had probable cause to arrest Owen and take him into custody for disorderly conduct.  Even if they did not have probable cause to arrest him for that offense, they had probable cause to arrest and take him into custody for simply disobeying the lawful order of a police officer.  And even if they did not have probable cause for that offense either, they still would be protected from liability by qualified immunity.  The defendants are entitled to summary judgement on the plaintiff's false arrest and false imprisonment claim.

**CONCLUSION**

The reasonable restriction on the time, place, and manner of Owen's speech did not violate his rights under the First Amendment.  The charges lodged against him did not violate his right to due process, nor did they subject him to false arrest or detention. The defendants' motion for summary judgment is therefore granted, and the case is dismissed.  The Clerk of Court shall close this case.

SO ORDERED.

Dated:   June 7, 2020
              Buffalo, New York


*/s/ Hon. Lawrence J. Vilardo*
_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE